**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ronald Folger, Julie Folger, and RBE
Properties, L.L.C., a Minnesota limited
liability company,

Civil No. 13-3489 (SRN/JJK)

Plaintiffs,

**MEMORANDUM OPINION**
**AND ORDER**

v.

City of Minneapolis, a municipal
corporation,

Defendant.

---

John R. Shoemaker, and Paul F. Shoemaker, Shoemaker & Shoemaker, P.L.L.C., 5270
West 84th St., Suite 410, Minneapolis, MN 55802, for Plaintiffs.

Tracey Fussy, and Sarah C.S. McLaren, Assistant City Attorneys, City Attorney's Office,
City Hall, Room 210, 350 South 5th St., Minneapolis, MN 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant City of Minneapolis's Motion for

Judgment on the Pleadings (Doc. No. 10). For the reasons stated below, this Court grants

the motion in part and denies the motion in part.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

According to the Complaint, Plaintiffs Ronald and Julie Folger and their company,

RBE Properties, LLC, allege that they owned twenty homes in the City of Minneapolis,

and rented the properties to low income tenants, many of whom received federal subsidies

for housing. (Doc. No. 1, ¶¶ 7, 9 & 10.) Most of Plaintiffs' tenants were African-

American or members of another "protected class." (Id. ¶¶ 11, 12.) The homes were

older and "located in the inner-city areas of Minneapolis," areas of poverty and with a "higher concentration of 'protected class' members." (Id. ¶¶ 13, 17, 21.)

Minneapolis requires owners of residential rental dwellings to license the properties with the City. (Id. ¶ 56.) Each of Plaintiffs' properties was licensed separately. (Id. ¶ 8.) Under the City's housing code, Plaintiffs were required to comply with certain specified minimum housing standards or face the denial, refusal to renew, revocation or suspension of a rental dwelling license. (Id. ¶ 57.) "Minneapolis has revoked numerous residential rental licenses of housing providers each year since 1991 and displaced hundreds of 'protected class' tenants from their homes." (Id. ¶ 58.)

In September 2010, Minneapolis commenced revocation proceedings against Plaintiffs with respect to the license for their rental property located at 1651 Penn Avenue North based on a failure to submit a written plan in response to a notice of disorderly use involving narcotics on the premises. (Id. ¶ 60.) In early 2011, the City approved the revocation of the license and ordered the property vacated. (Id. ¶ 62.)

In October and November 2010, the City pursued license revocation proceedings against Plaintiffs' property located at 3622 Humboldt Avenue North based on the alleged failure of Plaintiffs to allow an inspection. (Id. ¶¶ 63, 64.) The City approved the revocation and ordered the property vacated. (Id. ¶ 66.)

Shortly after the second revocation order, the City notified Plaintiffs that, based on the revocation with respect to the licenses for these two properties, they were, under the City's housing code, "ineligible to hold or have an interest in a rental dwelling license or

2

provisional license for a period of five (5) years." (Id. ¶ 68.)  The City thus notified

Plaintiffs that the City was seeking to revoke all of the remaining licenses Plaintiffs had

for rental properties in the City, without any determination of whether those properties

were in compliance with the housing code.  (Id. ¶¶ 70, 79.)  Plaintiffs' appeals were

unsuccessful and the City issued a final decision revoking the remaining licenses but

providing that the Plaintiffs' tenants would have ninety days to find replacement housing,

with assistance from the City.  (Id. ¶ 76.)  Plaintiffs allege that their tenants claimed that

the City "failed to follow through" with its promises of relocation assistance.  (Id. ¶ 81.)

Plaintiffs then filed the present action.  Their Complaint asserts six claims:  (1) a

claim under the Fair Housing Act ("FHA"), alleging a violation of 42 U.S.C. § 3604

(Count I); (2) a claim under 42 U.S.C. § 1983 alleging a violation of the FHA, 42 U.S.C.

§ 3608 (Count II); (3) a claim for injunctive relief under Section 3613 of the FHA (Count

III); (4) a claim under 42 U.S.C. § 1981 (Count IV); (5) a claim under 42 U.S.C. § 1982

(Count V); and (6) a claim under 42 U.S.C. § 1983 alleging violation of federal rights,

"including the right to equal protection of the laws guaranteed by the Fourteenth

Amendments [sic] and rights established by 42 U.S.C. Sections 1981, 1982 and 1983"

(Count VI).

Defendant filed its Answer and now seeks judgment on the pleadings under Rule

12(c).


## II.    DISCUSSION

Although the Complaint is not entirely clear, it is at least evident that all of Plaintiffs' claims, with the exception of Count III, allege discrimination with respect to housing, based largely on race.[1]  With respect to the individual claims other than Count III, some include allegations of both disparate treatment and disparate impact.  Count I, alleging a violation of 42 U.S.C. § 3604, asserts that the City "intended that [its] facially neutral . . . policy would have a discriminatory impact" on, and that the policy "did in fact disparately impact" members of certain protected groups.  (Doc. No. 1, § 128.)  Similarly, it alleges that the City's "policy and practice" of enforcing its housing codes "is facially neutral but discriminatory in intent and disparately impacts 'protected class' members." (Id. § 130; accord § 131.)[2]  Plaintiffs also allege, as a separate claim under Section 3608 (Count II), that the City's "intentional failure" to conduct an "'Analysis of Impediments' to fair housing" (an "AI") violates the FHA, and that the City's "intentional failure to conduct the 'AIs' demonstrates the intent . . . to intentionally discriminate" against certain protected class members.  (Id. §§ 142, 146.)  Yet "[s]uch failure of the City also demonstrates the recognized disparate impact on" such protected class members.  (Id. § 147; accord id. § 150 (alleging policies "were facially neutral but which had a disparate

---

[1]    Because Count III concerns remedies, namely injunctive relief, and Plaintiffs recognize that it "necessarily requires a finding of a discriminatory housing practice before injunctive relief would be authorized" (Doc. No. 22, at 44), it survives Defendant's Rule 12(c) motion only insofar as at least some of Plaintiffs' substantive claims would survive Defendant's motion.

[2]    Section 3604 prohibits five separate discriminatory practices with respect to housing, 42 U.S.C. § 3604(a)-(e), but Plaintiffs fail to identify in the Complaint the specific subsection(s) on which they rely.

impact").)[3]

_____

[3]      Count II alleges that the City violated its purported duty to affirmatively further fair housing ("AFFH") by failing to "conduct an 'Analysis of Impediments' to fair housing choice of protected class members." (Id. ¶¶ 142, 143.)  But it is far from clear how such a claim falls under Section 3608.  Even in a civil rights action, a court is not required "to divine the litigant's intent and create claims that are not clearly raised." Bediako v. Stein Mart, Inc., 354 F.3d 835, 840 (8th Cir. 2004).  Section 3608 addresses "Administration."  42 U.S.C. § 3608.  Unlike Section 3604, which contains the "operative provisions" of the FHA, 1 Rodney A. Smolla, Federal Civil Rights Acts § 3:11 (3d ed. 2014), Section 3608 does not expressly prohibit any particular activities or declare that any actions or omissions "shall be unlawful."  Although subsection (e) specifies certain "[f]unctions of [the] Secretary," including the duty to administer housing programs "in a manner affirmatively to further the policies of this subchapter," 42 U.S.C. § 3608(e)(5), these obligations are imposed on the federal "Secretary of Housing and Urban Development."  And Section 3602 defines "[d]iscriminatory housing practice" as "an act that is unlawful under section 3604, 3605, 3606 or 3617 of this title."  42 U.S.C. § 3602(f).  The Court further notes that Plaintiffs' response to the City's motion includes sections expressly devoted to Counts I, III, IV and V, but no comparable section defending Count II, even though the City had expressly challenged that claim.  (Doc. No. 13, at 29-36 (citing Doc. No. 1 (Complaint) ¶¶ 142-51.)  Finally, in a similar action, the Eighth Circuit, in addressing the plaintiffs' "other FHA claims," noted that the plaintiffs "also contend that the City failed to 'affirmatively further fair housing,' contrary to its certifications to HUD."   Gallagher v. Magner, 619 F.3d 823, 839 (8th Cir. 2010).  "Included in this duty, according to [the plaintiffs], was an obligation to analyze impediments to fair housing."  Id.  Although the Eighth Circuit stated that "[t]his claim is not properly before the Court because [the plaintiffs] failed to pursue it as anything more than background information before the district court," the court nonetheless ruled that were it to consider such a claim, it would "conclude that the City's duty to 'affirmatively further fair housing' has no independent significance."  Id.  Accord Charleston Housing Authority v. U.S. Dept. of Agriculture, 419 F.3d 729, 740 (8th Cir. 2005) (noting that plaintiff's failure to address AFFH claim on appeal reflects understanding that resolution of FHA disparate impact claim also resolves AFFH claim); Ellis v. City of Minneapolis, 2012 WL 3431126, *4 (D. Minn. Aug. 15, 2012) (dismissing purported FHA claim that city made and certified false statements to federal housing agency where plaintiffs failed to properly plead such a claim as one under the False Claims Act), aff'd, 518 Fed. Appx. 502 (8th Cir. 2013).  Here, too, although Plaintiffs purport to package as Count II their arguments regarding AFFH and AI as a separate claim, it is far from clear how the City's purported duties regarding AFFH and AI have any significance independent of the claim alleging a violation of Section 3604 as stated in Count I.  Thus the Court will consider, at least for purposes of this motion, Plaintiffs' *allegations* regarding AFFH and AI only

(continued...)

In contrast, Counts IV and V are expressly confined to allegations of intentional discrimination.  (Id. §§ 163, 164 (alleging that City acted "with racially discriminatory intent") (Count IV); id. § 168 (alleging that City has denied certain protected class members, "on account of race," their rights under Section 1982), § 169 (alleging that City's "discriminatory" policies "impaired Plaintiffs' property rights" (Count V).) Finally, Count VI alleges that certain City "officials, employees, representatives and agents" acted "intentionally and maliciously," and their "intentional and malicious conduct" violated Plaintiffs' rights.  (Id. §§ 179, 180.)[4]

In sum, the Court understands Plaintiffs to allege (1) claims of disparate treatment (parts of Counts I & II, and Counts IV, V & VI), and (2) claims of disparate impact (the remaining parts of Counts I & II).

## A.    Judgment-On-The-Pleadings Standard

Judgment on the pleadings is appropriate if there is no material issue of fact to be

---

[3](...continued)
insofar as they might bear on their FHA claim under Count I.

[4]    Count VI, denominated "Civil Rights Violations 42 U.S.C. Section 1983," purports to allege violations of the rights of "Plaintiffs and their tenants," "including the right to equal protection of the laws guaranteed by the Fourteenth Amendments [sic] and rights established by 42 U.S.C. Section 1981, 1982 and 1983."  Section 1983 does not provide or recognize any substantive rights, but rather merely authorizes a civil action for the deprivation, by one acting under color of State law, of rights secured by federal law. 42 U.S.C. § 1983; Ricketts v. City of Columbia, Missouri, 36 F.3d 775, 778-79 (8th Cir. 1994).  In addition, insofar as Counts IV and V already separately allege violations of Sections 1981 and 1982, respectively, the Court construes Count VI to be confined to a claim alleging violation of the Equal Protection Clause of the Fourteenth Amendment.

resolved and the moving party is entitled to judgment as a matter of law.  Buddy Bean

Lumber Co. v. Axis Surplus Ins. Co., 715 F.3d 695, 697 (8th Cir. 2013).  Rule 12(c)

"primarily is addressed to the . . . function of disposing of cases on the basis of the

underlying substantive merits of the parties' claims and defenses as they are revealed in

the formal pleadings."  5C Wright & Miller, Federal Practice and Procedure § 1367, at

205-06 (3d ed. 2004).  It is applicable "when the material facts are not in dispute between

the parties and a judgment on the merits can be achieved by focusing on the content of the

competing pleadings" and related materials.  Id. at 206-07.  It "only has utility when all

material allegations of fact are admitted or not controverted in the pleadings and only

questions of law remain to be decided by the district court."  Id. at 207-08.  The Eighth

Circuit has described the standard as "strict."  Lion Oil Co. v. Tosco Corp., 90 F.3d 268,

270 (8th Cir. 1996) (stating that movant must "clearly" establish lack of factual issues and

entitlement to judgment as a matter of law).

At the outset, the Court must address what materials may be considered in ruling

Analysis of a Rule 12(c) motion is governed by the same standard that applies to a

Rule 12(b) motion.  The Court accepts as true the factual allegations of the Complaint and

grants Plaintiffs all reasonable inferences from the pleadings.  Noble Systems Corp. v.

Alorica Central, L.L.C., 543 F.3d 978, 981 (8th Cir. 2008).  But it does not defer to any

legal conclusions or formulaic recitations of the claims' elements.  Minneapolis

Firefighter Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th

Cir. 2011).

At the outset, the Court must address what materials may be considered in ruling

on the City's motion because Plaintiffs strenuously object to certain materials submitted

by the City.  On a motion under Rule 12(c), as on a motion to dismiss for failure to state a

claim, the Court may consider only certain limited materials beyond the relevant

pleadings themselves, here the Complaint and the Answer.  "Ordinarily, only the facts

alleged in the complaint are considered in ruling on a 12(b)(6) motion.  However,

materials attached to the complaint as exhibits may be considered in construing the

sufficiency of the complaint."  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).

Accord County of St. Charles, Missouri v. Missouri Family Health Council, 107 F.3d

682, 684 n.3 (8th Cir. 1997); Hilton v. Pine Bluff Public Schools, 796 F.2d 230, 231-32

(8th Cir. 1986).[5]  As the court explained in Gibb v. Scott, this strict rule–precluding

consideration of "'any written or oral evidence in support of or in opposition to the

pleading that provides some substantiation for and does not merely reiterate what is said

in the pleadings'"–"will necessarily restrict a district court's consideration of a 12(b)(6)

motion to matters contained in the pleading" and thus serve the principle that a Rule 12

motion "will succeed or fail based upon the allegations contained in the face of the

complaint."  958 F.2d 814, 816 (8th Cir. 1992).

Here, nothing was attached to either the Complaint or the Answer.  Rather, the

materials at issue were submitted as exhibits in support of the Rule 12 motion.  (Doc. No.

---

[5]        "A copy of a written instrument that is an exhibit to a pleading is a part of
the pleading for all purposes."  Fed. R. Civ. P. 10(c); see Abels v. Farmers Commodities
Corp., 259 F.3d 910, 921 (8th Cir. 2001) (addressing Rule 10(c)).

14.)[6] Such materials are not thereby materials attached to *the pleadings*. Even facts asserted in the memoranda themselves, as well as statements made at oral argument, may not be considered unless they were first asserted in the pleadings. BJC Health System v. Columbia Cas. Co., 348 F.3d 685, 688 (8th Cir. 2003) (ruling that documents submitted in support of motion to dismiss, that "were provided 'in opposition to the pleading'" and were not undisputed, constituted "matters outside the pleading"); Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000) (explaining that court may not rely on "factual allegations contained in legal briefs or memoranda" but not in the pleadings); Hamm v. Rhone-Poulenc Rorer Pharmaceutical, Inc., 176 F.R.D. 566, 569 (D. Minn. 1997) (explaining that "allegation of plaintiff's counsel" that judge heard "at the hearing" but that was "not contained" in the complaint constituted matter outside the pleadings").

Nevertheless, the Eighth Circuit has also stated that while a district court addressing a Rule 12 motion "generally must ignore materials outside the pleadings," it "may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (internal quotations omitted) (concluding that court properly relied on transcript of proceedings from separate but related action).

Plaintiffs ask this Court to strike Exhibits 4, 5, 6, 7, 8 and 10 to the Affidavit of City's counsel. (Doc. No. 22, at 2, 17-20.) The City argues that the exhibits either are

---

[6]   Plaintiffs likewise submitted exhibits in opposition to the City's motion. (Doc. No. 21.)

public records, do not contradict the Complaint or contain admissions by Plaintiffs.  (Doc. No. 25, at 10-11.)  The Court will address, as necessary, each such extra-pleading exhibit individually.  The Court notes that it has not based its ruling on any of the exhibits, either those offered by the City in support of its motion or those offered by Plaintiffs, unless it has clearly ruled that any particular exhibit is appropriately considered on this Rule 12 motion.

### B.     Plaintiffs' Claims of Intentional Discrimination:  Disparate Treatment

With respect to those claims alleging intentional discrimination, that is, disparate treatment, Plaintiffs' claims can be divided into those brought under the Fair Housing Act, that is, part of Count I, and those brought under 42 U.S.C. Sections 1981, 1982 and 1983, that is, Counts IV, V and VI.[7]

### 1.     Fair Housing Act Claim

"Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims," the question being whether Defendant treated Plaintiffs "less favorably than others based on their race, color, religion, sex or national origin."  Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010).  "Proof of discriminatory purpose is crucial for a disparate treatment claim."  Id.  Defendant is entitled to judgment if Plaintiffs "cannot produce either (a) direct evidence of discriminatory intent or (b) indirect evidence creating an inference of discriminatory

---

[7]     As noted above, Count I is the sole claim of intentional discrimination under the FHA because Count II does not present a separately cognizable claim under the FHA.

intent under the *McDonnell-Douglas* burden-shifting framework." Id. "Direct evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse [housing] action." Id.[8]

The Court first notes that here, as in Gallagher, Plaintiffs do not assert a disparate treatment "claim under the *McDonnell Douglas* framework." 619 F.3d at 831. Thus the Court confines its analysis to whatever allegations of direct evidence might support Plaintiffs' claim. But despite the obvious parallels between the two actions, the facts as alleged here differ somewhat from those at issue in Gallagher, which concerned the housing code policies of the City of St. Paul, particularly those under Andy Dawkins as director of the department charged with enforcing the housing code. In Gallagher, the allegedly discriminatory practices consisted of more aggressive and organized code enforcement. For example, in Gallagher, "Dawkins favored owner-occupied housing over rental housing" and thus increased the level of "enforcement targeted at rental properties." Id. at 828. St. Paul housing "inspectors conducted proactive 'sweeps' to detect" violations and inspectors were instructed "to 'code to the max,'" by "writing up every violation." Id. In addition, the record disclosed "many statements that purportedly

---

[8]     As the Eighth Circuit has explained, in this context, "[d]irect evidence is not the converse of circumstantial evidence." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). "Rather, direct evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse . . . action." Id. "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Id.

show the 'discriminatory attitude' of Housing Code enforcement in" St. Paul (although

most were "not direct evidence of racial discrimination because they [had] little or no

connection" to St. Paul's policy or action).  Id. at 832.  Finally, Dawkins made statements

that could "demonstrate his desire and intent to reduce the amount of low-income tenants

in the City," although the statements were "facially raceneutral" and the plaintiffs "failed

to connect Dawkins' allegedly hostile attitude toward low-income tenants with

discriminatory intent."  Id.

        In addition, the precise nature of the claim here differs from the claim of

aggressive, targeted code enforcement at issue in Gallagher.  Here, the essence of

Plaintiffs' claim is not that the City should not enforce its housing code per se.  (Doc. No.

29, at 18 ("We've agreed all along that we're subject to the legitimate legal codes and

legal enforcement.").)  Rather the Complaint alleges that the City employed a facially

neutral policy, codified at Minneapolis Code of Ordinances, Section 244.1910(13),

"requiring rental dwelling license revocations of all licenses of a private housing provider

if the City revoked or cancelled two licenses."  (Doc. No. 1, ¶ 127.)[9]  Such an ordinance

might be termed the "automatic revocation" provision (as Plaintiffs often describe it), or

the "two-strikes-and-you're-out" rule (as this Court sometimes describes it).  As Plaintiffs

explain, the facially-neutral policy they challenge is "the rental dwelling revocation

---

        [9]      This claim is packaged amongst numerous allegations that seem to be
directed at a claim that the City's enforcement of the substantive provisions of the City's
housing code discriminates against members of certain protected classes.  But Plaintiffs
expressly disavow any such claim.  Thus the Court views such allegations as merely
background to Plaintiffs' claim that the automatic revocation provision is discriminatory.

policy," that is, the ordinance authorizing the City to initiate revocation of all of a

landlord's rental licenses if that landlord has had two licenses revoked on substantive

grounds.  (Doc. No. 22, at 23 (complaining of alleged discriminatory impact resulting

from "application of [City's] rental dwelling revocation policy applied to all families who

had nothing to do with the conduct that led to the loss of the first two dwelling

licenses").)  The relevant thrust of the Complaint is not that the City discriminatorily

revoked Plaintiffs' license with respect to the "first" property, that located at 1651 Penn

Avenue North, or that the City discriminatorily revoked Plaintiffs' license with respect to

the "second" property at 3622 Humboldt Avenue North.  At oral argument, Plaintiffs'

counsel "agree[d] they should be subject to legal codes and legal enforcement."  (Doc.

No. 29, at 11-12.)  As counsel explained:

> Our claim is not that the City cannot enforce their code.  What we have here
> is a specific provision that says if you've lost two rental dwelling licenses,
> you automatically lose the rest of the licenses.  We are not contesting that
> the City improperly revoked . . . the first dwelling at Penn Avenue or the
> second dwelling at Humboldt Avenue.

(Id. at 12-13.)  He reiterated:  "What we're contesting is the ordinance [is] automatic with

no modifying conditions.  Automatic revocation of the remaining 16 licenses which, then,

without any inspection by the City of habitability."  (Id. at 13.)  Although two of

Plaintiffs' properties were cited for substantive violations, Plaintiffs' claim is that with

respect to "the other 16, there was no analysis by the City as to whether those units, those

homes, were habitable. . . . [I]t's just an automatic revocation."  (Id. at 14.)  In short, the

essence of the Complaint focuses on the resulting revocation of all of Plaintiffs'

remaining licenses "for having lost two rental dwelling licenses" pursuant to Minneapolis Code of Ordinances, Section 244.1910(13).  (Doc. No. 1, ¶ 67; accord id. ¶¶ 68-81.)

Here, the City contends that the pleadings disclose no improper animus on the City's part in enforcing its housing codes.  In fact, the City first contends that the Complaint fails even to meet the pleading standards of Twombly and Iqbal, as Plaintiffs have alleged only "'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" and have failed "to provide any factual support for these conclusory statements."  (Doc. No. 13, at 11-12.)  And while the City acknowledges that the allegation of disparate treatment with respect to the Minneapolis Public Housing Agency ("MPHA")–that the City provided preferential treatment to MPHA properties–might at least identify a particular recipient of preferential treatment, the Complaint still fails "to identify any specific instances in which the City actually provided favorable treatment to MPHA."  (Id. at 12.)

The Court agrees that the Complaint discloses no non-conclusory allegations of specific instances of discriminatory intent.  Moreover, there is no basis for leave to amend because the deficiency here is not just that the Complaint only alleges, in the most conclusory fashion, that the City intended to discriminate against certain protected classes.  Had Plaintiffs *any* factual basis to allege such an animus on the party of the City, surely such allegations would have been included somewhere in their thirty-nine page Complaint.[10]  Insofar as a disparate treatment claim is easy to understand, Ricci v.

_____

[10]     Unlike the situation addressed in Gallagher, where there were racially
(continued...)

DeStefano, 557 U.S. 557, 577, 129 S. Ct. 2658, 2672 (2009) (noting that "[d]isparate-treatment cases present 'the most easily understood type of discrimination'"), it should also be easy to plead in a non-conclusory fashion, assuming there is in fact any basis to claim such intentional discrimination.[11]  In sum, the shortcoming is not just one of form–that is, the omission of sufficient allegations–but of content and plausibility–the omission of allegations that particular City policies or personnel took specific actions intentionally based on race or another improper criteria.

Plaintiffs appear to concede as much as they rest their claims of intentional discrimination entirely on the theory addressed in Village of Arlington Heights v. Metropolitan Development Corp., 429 U.S. 252, 97 S. Ct. 555 (1977), that is, that "discriminatory intent may be inferred from the City's knowledge that its actions would likely have a disproportionate impact on racial minorities."  Gallagher, 619 F.3d at 833.  In Arlington Heights, the Supreme Court recognized that evidence of a disparate impact "may provide an important starting point" in discerning a discriminatory intent or purpose, but only in the "rare" case where a "clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing

---

[10](...continued)
derogatory remarks by the defendants, 619 F.3d at 823, 832, here the Complaint discloses no such comparable racial or other improper animus.

[11]      The Court understands that not every claim of intentional discrimination can be substantiated with expressly racist statements.  But here, the Complaint simply discloses no allegation reflecting discriminatory motive or intent–no statements, policies, or documents even hinting that the City intended to dislocate African-Americans or others by purposely targeting their homes.

legislation appears neutral on its face," and is so stark that the impact alone is determinative of a discriminatory intent or purpose.  429 U.S. at 266, 97 S. Ct. at 563-64.

Here, Plaintiffs contend that "it is clear" that the "impact of Minneapolis' revocation decision regarding Plaintiffs' rental dwellings arguably bears more heavily on racial minorities."  (Doc. No. 22, at 37.)  Plaintiffs further allege that the City had "special knowledge of the disproportionate needs and vulnerabilities of 'protected class' members, especially Blacks, for affordable housing in a city with a prolonged low-income housing crisis."  (Id. at 38.)  Plaintiffs contend that the City "also knew of the City's higher duty of care, the AFFH duty, and HUD's strong suggestion to the City concerning the suggested scope of an 'AI' that would have naturally focused on the City's rental licensing revocation policies and the impact on 'protected classes.'"  (Id.)  Thus, Plaintiffs conclude, "[i]n light of the specialized knowledge and higher duty, the City's forced displacement of 16 families who were all minorities reaches the level of a 'clear pattern, unexplainable on grounds other than race.'"  (Id.)

But here, even assuming a disparate impact, although "[t]he impact of the [municipality's] decision does arguably bear more heavily on racial minorities," any such disparate impact hardly rises to the "rare" case of a pattern so "stark" that it can not be explained on any grounds other than race.  Arlington Heights, 429 U.S. at 267-68, 97 S. Ct. at 564-65.  The City plainly has an interest in enforcing its housing codes–a point Plaintiffs' counsel recognized at oral argument.  (Doc. No. 29, at 12 ("Our claim is not that the City cannot enforce their code.").)  And insofar as Plaintiffs' tenants are low-

income residents, and Plaintiffs' buildings are older structures in need of more frequent and substantial maintenance, under Plaintiffs' theory as alleged in the Complaint a neutral enforcement of housing codes might inevitably fall more heavily on Plaintiffs' properties, but without any resulting disparate impact on Plaintiffs' tenants suggesting any improper animus.

Moreover, the City notes that Plaintiffs allege that other landlords, particularly the MPHA, received treatment more favorable than Plaintiffs received, yet those other landlords also rent primarily to protected-class tenants.  (Doc. No. 25 at 2.)  The City thus argues that allegations of disparate impact on Plaintiffs compared to the MPHA can not serve as evidence of disparate treatment of protected-class members.  (Id.)  The Court agrees.  If the City held any improper animus towards, for example, racial minorities, one would plausibly assume that it would direct that animus without selective targeting of only some landlords that rent to such protected-class members.  Moreover, if the City did selectively direct its animus towards fewer than all such renters in the City, one would think the City could inflict its animus on more such renters by selecting the MPHA as its target, insofar as it operates many more properties and rents to many more protected-class members, compared to Plaintiffs.  Thus, even though the Court accepts as true the allegations of the City's favorable treatment towards MPHA, such allegations do not support a claim of disparate treatment of any of Plaintiffs' protected-class tenants.  In short, by enforcing its "two strikes and you're out" rule against Plaintiffs, the City has revealed no "clear pattern" of discriminatory impact that is so "stark" that it could

establish discriminatory treatment under <u>Arlington Heights</u>.

Absent such a stark pattern, the Supreme Court in <u>Arlington Heights</u> stated that "other evidence" of discriminatory intent must be considered, such as:  (1) the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes," (2) the "specific sequence of events leading up [to] the challenged decision," (3) "[d]epartures from the normal procedural sequence," (4) substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and (5) the legislative or administrative history, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  <u>Id.</u> at 267-68, 97 S. Ct. at 564-65.

But here, the other evidence on which Plaintiffs rely does not support any inference of discriminatory purpose.  Plaintiffs contend that "there exists a series of official actions by Minneapolis that appear to have consistently been taken for invidious purposes."  (Doc. No. 22, at 39.)  Plaintiffs rely on the 2001 AI to contend that the City thereby learned that protected-class members had relatively greater difficulty finding housing and that the City knew its housing code policies could have a greater impact on such renters.  (<u>Id.</u>)  Plaintiffs then assert that the City, "[w]ith this special knowledge," "decided to forego a subsequent AI for 8 years."  (<u>Id.</u>)  Plaintiffs also allege that the City ignored HUD's suggestion that the City update its "AI" more frequently and that the City failed to review and address barriers to fair housing according to its purported duty to

affirmatively further fair housing.  (Id. at 39-40.)  In addition, Plaintiffs contend that the

City was aware of the disparate impact resulting from the enforcement of its housing code

based on "the allegations presented" in a separate action filed in February 2011 (the "*Ellis*

action").  (Id. at 40.)[12]  Finally, Plaintiffs argue that the Minnesota Tenants Union notified

the City that its license revocation ordinance would "negatively impact[ ] 'protected

class' members."  (Id. at 41.)

Accepting the allegations as true, much, if not all, of this reduces to the claim that

the City knew that enforcing its housing code policies would have a greater impact on

members of a protected class insofar as such tenants were more likely to be lower-income

tenants inhabiting older buildings.  But even assuming the truth of that allegation,

Plaintiffs are left only with the argument that the City knew that a disparate impact

resulted from the City's enforcement of its facially neutral housing code.  And "[a]

discriminatory purpose is more than a mere 'awareness of the consequences.'"  Ricketts

v. City of Columbia, Missouri, 36 F.3d 775, 781 (8th Cir. 1994).  Discriminatory purpose

"implies more than intent as volition or intent as awareness of consequences."  Personnel

Administrator of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979).  "It

implies that the decisionmaker . . . selected or reaffirmed a particular course of action at

least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

---

[12]      But the *allegations* asserted in another action are just that, not evidence of
disparate impact, much less a judgment that the City did in fact discriminate against
protected class tenants, and thus provide little, if any, support for an inference of a
discriminatory purpose.

group." Id.[13]

Here, even assuming that the City knew that its actions were having a disparate

impact on a protected class, any such knowledge does not–without more–establish one's

discriminatory intent.  Gallagher, 619 F.3d at 833.  In Gallagher, it was not contested that

the City targeted properties occupied mostly by low-income tenants and there was

evidence that racial minorities were disproportionately represented within the population

of low-income tenants.  Id.  But "those low income tenants included people of all races."

Id.  "Such conduct may be actionable, but not under the rubric of disparate treatment."

Id.

This seems particularly true here, where Plaintiffs acknowledge that they do not

take issue with the City's enforcement of its code per se.  Rather, Plaintiffs take issue

with the City's "two-strikes-and-your-out" ordinance–that is, that the revocation of two

licenses on substantive grounds triggers proceedings to revoke any and all other licenses

that landlord possesses.  (Doc. No. 22, at 42-43 (contending that the City "could have"

taken various alternative actions other than revoking the remainder of Plaintiffs' rental

licenses).)  Compared to the facts of aggressive, targeted code enforcement in Gallagher

_____

[13]     As the Supreme Court noted, where "the impact is essentially an
unavoidable consequence of a legislative policy that has in itself always been deemed to
be legitimate, and when" the other evidence demonstrates that the adverse effects were
not intended to discriminate, any inference of intent based on impact fails.  Id. at 279
n.25, 99 S. Ct. at 2296 n.25.  Here, the actions at issue–housing code enforcement–are
taken for the benefit of all and any disparate impact is the result of the landlords' failures
to comply with that code rather than of the City's enforcement.  Knowledge of an
unfortunate side effect of a legitimate policy designed to benefit all does not support an
inference of any improper motive required to demonstrate disparate treatment.

and the plaintiffs' claim there that such a policy had a discriminatory motive, the precise claim at issue here–that the automatic revocation provision was intended to discriminate–is even more attenuated in terms of any argument that disparate impact is evidence of such an alleged discriminatory motive. And, of course, a law providing that two separate violations triggers revocation proceedings with respect to any other such properties does not, by itself, suggest any improper animus. A municipality, with the entirely proper intent of preventing widespread, if not chronic, housing code violations with respect to multiple buildings owned by a single landlord, may plausibly elect to impose such a rule rather than pursue enforcement with respect to each and every rental property that landlord owns. Under basic standards of plausibility, it somewhat strains credulity to contend that a municipality would–in order to effectuate its purported discriminatory motive–enact an ordinance requiring a particular landlord to forfeit all of his remaining rental licenses upon being found in violation, with respect to two rental properties, of facially-neutral housing codes, under the assumption that the tenants thereby impacted by the automatic revocation would be disproportionately members of a protected class. In sum, Plaintiffs' allegations regarding any disparate impact purportedly resulting from the City's policies simply do not rise to the level of establishing discriminatory motive or intent.

The City is therefore entitled to judgment on the pleadings with respect to any claim of intentional discrimination under the FHA. The Complaint consists of nothing more than conclusory allegations devoid of any plausible basis that the City enforced its

housing code with the motive or intent to discriminate against any protected class at issue here.

### 2.      Claims Under 42 U.S.C. §§ 1981, 1982 & 1983

Here, as in Gallagher, Plaintiffs' claims pursuant to Section 1981 and Section 1982 "are duplicative with their FHA disparate treatment claims, as the underlying constitutional violations for these claims require a showing of discriminatory intent." 619 F.3d at 839. Plaintiffs, deferring to their disparate treatment arguments, contend there is sufficient evidence of racial animus to support their claims under Sections 1981 and 1982. The Court concludes that because there is insufficient evidence that Defendant enforced its housing codes policies with discriminatory intent, Defendant is also entitled to judgment on the pleadings with respect to Counts IV and V.[14]

With respect to the remaining portion of Count VI, the Court understands Plaintiffs to allege a violation of the Equal Protection Clause of the Fourteenth Amendment. Here too, only claims alleging intentional discrimination, not claims alleging disparate impact, are cognizable under the Equal Protection Clause. Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049 (1976). To prevail on such a claim, Plaintiffs "must prove that the City 'intentionally treated [them] differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Gallagher, 619 F.3d 823, 839

---

[14]      As noted above, although Count VI purports to base a claim at least in part on Sections 1981 and 1982, the Court has found that portion of Count VI to be entirely duplicative of Counts IV and V. See supra n.4. In any event, the City would be entitled to judgment as to that portion of Count VI that could be premised on Sections 1981 and 1982.

(quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1973 (2000)).

As with Plaintiffs' other claims of intentional discrimination, the Court discerns no basis

for an equal protection claim.

And as Defendant observes, although the City challenged the Plaintiffs' allegations

in Count VI of a deprivation of their equal protection rights (Doc. No. 13, at 27-29),

Plaintiffs offered no defense of any equal protection claim in their response (Doc. No. 25,

at 17-18).  The Court notes that Plaintiffs' response to the City's motion includes sections

expressly devoted to Counts I, III, IV and V, but nothing expressly addressed to Count

VI.  Because this Court discerns no attempt by Plaintiffs in their briefing or at oral

argument to support Count VI in general or to defend any claim under the Equal

Protection Clause in particular, and because, in any event, such a claim is confined to

intentional discrimination, the Court grants Defendant judgment on Count VI.

In sum, because disparate treatment claims under the FHA as well as

discrimination claims under the Equal Protection Clause and Sections 1981 and 1982

require evidence of a discriminatory motive or intent and the Complaint offers only the

most conclusory allegations of such intent, the Court grants judgment to the City with

respect to all of Plaintiffs' claims of intentional discrimination.

### C.    Plaintiffs' Claim of Disparate Impact

As noted above, Plaintiffs' claims under the FHA, Counts I and II, include

disparate-impact claims in addition to disparate-treatment claims, but Count II does not

articulate a claim with any significance independent of that stated in Count I.  With

respect to the disparate-impact claim of Count I, the three-part burden-shifting analysis

first applied to employment discrimination claims also governs here.[15] Gallagher, 619

F.3d at 833.  To survive a motion for summary judgment, much less to prevail at trial, a

plaintiff must first establish a prima facie case, that is, a showing that the actions of which

he complains resulted in a disparate impact upon a protected class compared to a relevant

population.  Id.  In other words, a plaintiff must prove that a facially-neutral policy had a

significant adverse impact on members of a protected minority group.  Id.  But

---

[15]     Although the courts have been entertaining disparate-impact claims under the FHA for many years, the City first argues that the FHA permits only disparate treatment claims, that is, that disparate impact claims are not cognizable under that statute.  (Doc. No. 13, at 22-25.)  The City relies on the Supreme Court's recent clarification that disparate-impact liability under a particular statute is largely a function of statutory interpretation and that while a statute prohibiting certain actions taken "based on" race, or "because of" race, supports disparate-treatment liability, disparate-impact liability is supported only by a statutory provision prohibiting, for example, certain conduct that "would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect his status as an employee*, because of such individual's age."  Smith v. City of Jackson, Miss., 544 U.S. 228, 235, 125 S. Ct. 1536, 1542 (2005) (quoting § 4(a)(2) of the ADEA) (emphasis added in Smith).  Accord Ricci v. DeStefano, 557 U.S. 557, 577, 129 S. Ct. 2658, 2672 (2009) (observing that provision making it unlawful to take negative action against an employee "because of such individual's race, color, religion, sex, or national origin" imposes only disparate-treatment liability).  The City observes that here, Section 3604 prohibits certain specified practices "because of race, color" or other criteria, 42 U.S.C. § 3604(a), (b), (d), (f), or "that indicates any preference, limitation, or discrimination based on race" or other criteria, id. § 3604(c).  But while the Supreme Court has now twice granted writs of certiorari on the precise issue of whether the FHA supports disparate-impact liability, it has not yet had the opportunity to rule on the issue.  And in Gallagher, in ruling on the petitions for rehearing, the *en banc* Eighth Circuit denied the petitions over the express dissent of five judges who raised the issue of whether the FHA supports disparate-impact liability.  636 F.3d 380, 381 (2010) (Colloton, J., dissenting).  In short, until the Supreme Court squarely addresses the issue or the Eighth Circuit overrules its existing decisions, this Court is not the proper tribunal to find that the FHA is confined to disparate-treatment liability.

discriminatory intent need not be shown.  Id.  If the plaintiff establishes such a prima

facie case, the burden shifts to the defendant to demonstrate that its policy or practice had

a manifest relationship to a legitimate, nondiscriminatory policy objective and was

necessary to the attainment of that objective.  Id. at 834.  If the defendant establishes that

its actions were justified, then the plaintiff must show a viable alternative means was

available to achieve the defendant's objective without imposing discriminatory effects.

Id.

        Here, as discussed above, the thrust of Plaintiffs' claim is not that the City should

not enforce its housing code *per se,* but rather that the City employed a facially neutral

policy "requiring rental dwelling license revocations of all licenses of a private housing

provider if the City revoked or cancelled two licenses" due to substantive violations,

purportedly causing a disparate impact on a protected class.  (Doc. No. 1, ¶ 127.)

        With respect to the "relevant population" to which Plaintiffs should be compared,

the Complaint suggests that the alleged adverse impact should be compared against the

non-protected population of "Minneapolis overall."  (Doc. No. 1, ¶ 21; see id. ¶¶ 16-36

(alleging that Plaintiffs' properties were located in low income and/or non-white

neighborhoods "compared to Minneapolis overall," and that the City was experiencing a

housing shortage for such protected class members).)  The Complaint also alleges that the

City treated Plaintiffs less favorably than it treats the Minneapolis Public Housing

Agency ("MPHA"), which "provides affordable housing to low-income individuals and

families, including to minorities and the disabled similar to Plaintiffs' former tenants."

(Doc. No. 1, ¶ 108.)  The Complaint further alleges that while the City allows the MPHA "to prioritize maintenance, repairs and capital improvements to meet budget constraints and to spread out time-wise such required repairs on MPHA rental properties," the City "refuses to allow private owners including Plaintiffs" the same accommodation because the City "demands immediate actions by the private housing providers to remedy all claimed code requirements without delay."  (Id. ¶¶ 111-12; accord ¶¶ 113-16 (alleging "preferential" treatment accorded to MPHA).)

Nevertheless, the City contends that "[w]hile Plaintiffs' Complaint contains a multitude of statistics, they do not support an inference of disparate impact" because the statistics regarding Plaintiffs' own tenants "are never actually compared to the relevant population."  (Doc. No. 13, at 15.)[16]  As the court in Gallagher explained,

> a common method of showing a disproportionate adverse effect is to compare levels of dependence on affordable housing.  Where a plaintiff demonstrates that a protected group depends on low-income housing to a greater extent than the non-protected population, other courts have found it reasonable to infer that the protected group will experience a disproportionate adverse effect from a policy or decision that reduces low-income housing.

Id. at 835.

---

[16]    Even so, the City suggests that Plaintiffs claim that they were treated disfavorably compared to another private landlord, Spiros Zorbalas.  (Doc. No. 25, at 16 ("Plaintiffs' claim is really that 'the City is not treating the Folgers the same as the Zorbalas.'").)  The Complaint alleges that Zorbalas "was faced with City licensing revocation proceed[ings] against all remaining licensed properties" (Doc. No. 1, ¶ 59), without expressly alleging that the City treated the two property owners differently.  Nevertheless, the City's Answer affirmatively states that "through working with [Zorbalas]," who also faced revocation proceedings regarding his remaining licenses after losing three licenses for substantive violations, the City did not revoke any "additional licenses."  (Doc. No. 8, ¶ 59.)

But <u>Gallagher</u> was before the Eighth Circuit on appeal from summary judgment. To withstand a motion for summary judgment, a plaintiff alleging disparate impact with respect to housing must support such a claim with evidence that a municipality's enforcement of its housing code "resulted in a disproportionate adverse effect on racial minorities." <u>Gallagher</u>, 619 F.3d at 835. And "[o]f course, merely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim. Plaintiffs must also show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population." <u>Id.</u> at 836 n.4.

But at this early stage of the proceedings, the allegations here–while not particularly focused in terms of which precise population should serve as the proper comparative group–are sufficient to assert a plausible claim of disparate impact. Given the allegations that there is a shortage of affordable housing in Minneapolis, and that Plaintiffs' tenants were largely racial minorities and low-income renters, it is not unreasonable to infer that enforcement of the automatic revocation provision–which presumably reduces, at least temporarily, the amount of affordable housing in the City–could have a disproportionate impact on such protected-class members.

Next, the City contends that Plaintiffs and their tenants did not in fact suffer any injury from the City's enforcement of its housing code. The City argues that "Plaintiffs' prima facie case also fails because nothing in the record shows their tenants were actually unable to find suitable housing." (Doc. No. 25, at 13; <u>accord</u> Doc. No. 13, at 16

(contending that "Plaintiffs fail to identify any tenant actually displaced by the rental license revocation").)  It further asserts that "Plaintiffs have merely switched from renting their homes to selling them under a contract-for-deed."  (Id.)[17]  Although much of the City's argument might be well-directed in opposing Plaintiffs' claims on the merits at a later stage in the proceedings, the allegations of the Complaint, to which this Court generally must confine itself on a Rule 12 motion and which it must accept as true, are sufficient at this stage to meet Plaintiffs' pleading burden.

The Complaint alleges that as a result of the revocation of Plaintiffs' remaining rental licenses after losing two licenses for substantive violations, "Tenants' lives were substantially disrupted in being displaced from their rental homes," and that Plaintiffs incurred "financial losses."  (Doc. No. 1, ¶¶ 82, 88.)  With respect to the tenants, it is not unreasonable to infer that their landlord's loss of the rental license would have a negative

---

[17]      In support of this argument, the City relies on statements from a newspaper article.  (Doc. No. 13, at 16 (quoting Doc. No. 14, Ex. 5).)  But this Court may not consider, on a Rule 12 motion, a newspaper article cited by Defendant to contradict the allegations of the Complaint.  "For what purpose would [the defendant] have provided the documents to the district court, other than to discredit and contradict [the plaintiff's] allegations?"  BJC Health System v. Columbia Cas. Co., 348 F.3d 685, 688 (8th Cir. 2003) (ruling that documents submitted in support of motion to dismiss, that "were provided 'in opposition to the pleading'" and were not undisputed, constituted "matters outside the pleading").  Accord Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 832 (8th Cir. 2003) (noting that district court did not abuse its discretion in declining to take judicial notice of documents "offered for the truth of the matters asserted in them" where opposing party "disputes the facts and inferences that the [offering parties] attempt to establish through" such documents).  Moreover, although Plaintiffs might have mitigated some of their damages by selling some of their properties or taking other actions, a point which Plaintiffs themselves assert in their Complaint (Doc. No. 1, ¶¶ 91, 92 & 97), the Court cannot conclude on the present record that Plaintiffs or their tenants suffered no injury whatsoever.

impact on their housing situation, particularly for low-income tenants in a tight rental market.  And with respect to Plaintiffs themselves, the Complaint further alleges that "[m]ost of the seller financing contracts" are "substantially non-performing loans," and that following revocation of their rental licenses "Plaintiffs' losses continue to mount." (Id. ¶¶ 92, 94.)  In any event, at this stage of the proceedings, Plaintiffs are entitled to the reasonable inference that the loss of all of the licenses necessary to conduct one's rental business inflicts some loss on both the landlord and the tenants.  On summary judgment, however, Plaintiffs would have to substantiate their allegations of injury with evidence that they and their tenants did in fact incur financial loss or other injury causally traceable to the enforcement of the automatic revocation ordinance.

Thus the burden would shift to the City to show a legitimate, non-discriminatory objective.  Here, there can be little if any doubt that housing code enforcement has a valid function beneficial to all.  Gallagher, 619 F.3d at 837.  Plaintiffs here seem to acknowledge as much, as they disavow any claim that the City may not enforce its code based on substantive violations.  Rather the action of which they complain is the effect of the automatic revocation ordinance (even though that revocation is triggered by two valid revocations resulting from documented substantive violations).  Plaintiffs "do not concede that Minneapolis' enforcement of the . . . [automatic] revocation ordinance" is necessary to promote a compelling governmental interest.  (Doc. No. 22, at 27 (contending that it would be irrational to, e.g., force "98 families out on the street" simply because their landlord owned two other properties that were cited for substantive

violations).)  But such a prophylactic provision, at least one that is facially neutral, serves

a legitimate non-discriminatory objective insofar as it effectuates the same purposes that

enforcement of substantive violations serves.  It is not irrational on its face for the City to

conclude that a landlord who has incurred substantive violations with respect to two

properties is also likely to not be adhering to the housing code with respect to any

additional rental properties it owns.  As the City asserts, "business owners who lose two

licenses have demonstrated they do not have the skills, desire or judgment necessary to

provide decent housing," such that the automatic revocation ordinance plainly serves the

City's purpose, consistent with the goals of the FHA, to ensure safe and decent housing

for all.  (Doc. No. 25, at 15; accord id. at 3 (asserting that City's policy protects tenants

"from business owners who have proven, through the loss of rental licenses, that they do

not have the necessary ability, judgment or desire to put the needs of the protect[ed] class

member or community before their own financial gain").)

    Accordingly, the burden would shift back to Plaintiffs to allege that the City has a

viable alternative that satisfies its legitimate policy objective while reducing the allegedly

discriminatory impact of the City's current code enforcement practices.  Gallagher, 619

F.3d at 837.  For example, in Gallagher, the plaintiffs identified St. Paul's former program

for housing code enforcement, "Problem Properties 2000."  Id.  Because there was

evidence of record from which one could reasonably infer that the program could

significantly reduce the impact on protected class members, the Eighth Circuit concluded

there was a genuine issue of material fact sufficient to defeat St. Paul's motion for

summary judgment.

Here, on a motion for judgment on the pleadings, Plaintiffs need not do more than identify, through plausible, non-conclusory allegations, viable alternatives to the City's present automatic revocation ordinance.  The City contends that Plaintiffs merely conclude, in the statement of Count I, that the City "had reasonable and available alternatives that would have had less discriminatory impact on 'protected class' members but choose [sic] not to adopt such policies," but without including in the body of the Complaint any allegations that "actually identify any of these alternatives."  (Doc. No. 13, at 20.)

But the Complaint, although not entirely clear, alleges that the City treated the MPHA more leniently than it treated private landlords such as Plaintiffs.  (Doc. No. 1, ¶¶ 112-13 (asserting that compared to how it treats the MPHA, "Minneapolis demands immediate actions by the private housing providers to remedy all claimed code requirements without delay"), ¶¶ 115-18.)  Additionally, the City itself acknowledges that it "worked with" another private landlord who faced automatic revocation proceedings in such a fashion that no further licenses were revoked.  (Doc. No. 8, ¶ 59.)[18]  And finally, the Complaint alleges that the City could have conducted analyses of impediments to fair housing pursuant to the guidance provided by the federal Department of Housing and Urban Development ("HUD").  (Doc. No. 1, ¶¶ 120-24.)  Plaintiffs allege that HUD's

[18]      But as noted above, insofar as the MPHA or Zorbalas also rented primarily to members of a protected class, the fact that the City allegedly treated those landlords more preferably than it did Plaintiffs might undermine Plaintiffs' argument that the automatic revocation ordinance has a disparate impact on such protected-class members.

Fair Housing Planning Guide provides guidance to municipalities regarding methods of

ensuring fair housing and eliminating housing impediments to members of protected

classes.  (Id.)  In short, Plaintiffs' allegations regarding viable alternatives to the

challenged practice are presently sufficient.  Whether Plaintiffs could produce evidence

that there was another means to achieve the goals of the automatic revocation ordinance

without any unfortunate side effect of a disparate impact on the protected classes to which

Plaintiffs formerly rented is not presently at issue.

In addition, the City, contending that it "already had such a program in place"

since 2004, namely the "Problem Properties Unit," argues that "Plaintiffs have failed to

adequately plead that there was a 'viable alternative means' to the City's policies and

practices and will not be able to identify one that does not already exist."  (Doc. No. 13, at

21.)[19]  But the fact that the City might have one viable alternative in place does not mean

---

[19]    Plaintiffs object to the Court's consideration of the document describing the
Problem Properties Unit (Doc. No. 14, Ex. 6).  But such a document–an official
description of a municipal program that is available on the City's website–does not fall
outside of the range of permissible materials that a court may consider on a Rule 12
motion because the facts that the document reflects, that is, the City's description of its
own program, are beyond dispute.  Thus, the Court may take judicial notice of the
document.  DeVary v. Countrywide Home Loans, Inc., 701 F. Supp. 2d 1096, 1111-12
(D. Minn. 2010) (explaining that a "court may take judicial notice only of a fact that is
'not subject to reasonable dispute' because 'it is either (1) generally known within the
territorial jurisdiction of the trial court or (2) capable of accurate and ready determination
by resort to sources whose accuracy cannot reasonably be questioned'" (quoting Fed. R.
Evid. 201(b))).  The document would also appear to be a public record.  Noble Systems
Corp. v. Alorica Central, LLC, 543 F.3d 978, 982 (8th Cir. 2008) (determining that a
financing statement filed with the relevant jurisdiction's Secretary of State "is a public
record that can be considered even if not mentioned expressly in the pleadings").  But the
Court clarifies that is not also considering the two newspaper articles discussing the
City's program (Doc. No. 14, Exs. 7 & 8).

that Plaintiffs could not be able to identify some other viable alternative.  And it is not

entirely clear that a program in place since 2004 would be an "alternative" to the

challenged practice that had continued in force since then.  If the City was pursuing both

simultaneously, the two programs could likely have somewhat different objectives.  The

automatic revocation ordinance presumably seeks to prophylactically address what might

be termed "repeat offenders" (those landlords with two substantive violations).  The

Problem Properties Unit, however, is not addressed to such repeat offenders, but rather is

"charged with identifying [and addressing] the City's *worst* properties," that is, what

might be termed acute rather than chronic offenders.  But again, resolution of such issues

would be addressed at summary judgment.

> **D.** **Sanctions**

In their response to the City's motion, Plaintiffs request Rule 11 sanctions for

various allegedly improper actions by the City.  (<u>E.g.</u> Doc. No. 22, at 2 (objecting to

City's provision of various exhibits in support of its motion).)  But no motion under Rule

11 has been filed.  Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made

separately from any other motion and must describe the specific conduct that allegedly

violates Rule 11(b).").  And in any event, the Court does not view the conduct of which

Plaintiffs complain as sanctionable.  For example, the fact that the City offered some

material that the Court has concluded should not be considered on a Rule 12 motion

hardly constitutes sanctionable conduct.  Thus Plaintiffs' request for sanctions is denied.

## III.    CONCLUSIONS

For the reasons discussed above, the Court dismisses Count II with prejudice, and grants the City judgment on Counts IV, V and VI as well as on the disparate-treatment component of Count I.  With respect to the remaining portion of Count I, because Plaintiffs' allegations are sufficient to state a claim for disparate-impact liability under the FHA, Plaintiffs' request for leave to amend their Complaint to remedy any pleading deficiencies is moot.

## IV.   ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's motion for judgment on the pleadings [Doc. No. 10] is **GRANTED IN PART** (with respect to the disparate-treatment claim of Count I and the claims of Counts II, IV, V and VI) and **DENIED IN PART** (with respect to the disparate-impact claim of Count I and the claim for injunctive relief of Count III).


Dated:   August 22, 2014                          s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge